# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 2:11-cr-00077-PPS |
| | ) | |
| RICHARD REYES | ) | |

## OPINION AND ORDER

A jury convicted Richard Reyes of a racketeering conspiracy, conspiracy to deal drugs, and murder in furtherance of the RICO conspiracy, all stemming from his membership in the Imperial Gangsters street gang. Reyes now moves for a judgment of acquittal or a new trial based on five areas that he identifies as creating reversible error in his trial. After careful consideration of each of Reyes's arguments I find that none of them provides a basis for overturning the jury's verdict, so the motion is **DENIED**.

## BACKGROUND

Most of the facts of this case, the history of motions, and the detailed contents of the several-day trial aren't relevant to this motion, so I won't recount them here. But I will offer a brief overview to put some of the arguments into context. Defendant Richard Reyes is a member of the Imperial Gangsters (the "IGs"), a gang that was active in northwest Indiana from at least 2002 through 2010. The IGs bought and sold large quantities of cocaine and marijuana, conducted gang business, committed various armed robberies of drug stash houses, patrolled territory to which they laid claim, and fought with rival gangs in East Chicago, Gary, and elsewhere in northern Indiana. The indictment charged 14 separate murders and several attempted murders that were

alleged to have been committed in furtherance of the RICO enterprise. In January 2014 a jury convicted Reyes of RICO conspiracy, a drug conspiracy and murder in furtherance of the enterprise.

Part of the conspiracy dealt with an ongoing feud between the IGs and the Latin Kings, a rival gang to the IGs. The two gangs regularly fought with one another, shot at one another and committed other acts of violence towards one another. *See, e.g.*, Tr. Vol. 3 at 658-59. One of the acts of violence that stemmed from the gang rivalry was the 2007 murder of a Latin King named Rene Alonzo. It is this murder for which the jury convicted Reyes.

The very abbreviated back story of the Alonzo murder is necessary in order to put Reyes's present motion into some context: On a late summer day in 2007, several gang members went to an East Chicago community event, the Mexican parade, and the Mexican festival that followed. At the festival, an IG-affiliate named Armando Ortega was punched by a man who had been standing with Rene Alonzo and some others. Ortega was understandably upset at being sucker punched, and yet he was the one removed from the Festival by the police. Tr. Vol. 4 at 924-29, 1022, 1044-47, 1049-50. Later that night, Alonzo's group went to a nearby bar. Tr. Vol. 3 at 860; Tr. Vol. 4 at 929. Ortega testified that Reyes picked him up that evening in Reyes's minivan, and set a course to that same bar seeking revenge against Alonzo. Reyes also mentioned that the attack was related to someone hassling some IG initiates (younger people hoping to join the gang, called "shorty folks"). Upon arriving outside the bar, Reyes used Ortega's gun

to shoot and kill Alonzo who happened to be standing outside the bar at the time. Tr. Vol. 4 at 1058-69. Several witnesses identified Reyes as the shooter.

As it related to the murder charge, Reyes's primary defense at trial was that he had loaned his minivan to Ortega, and that it was Ortega — not Reyes — who committed the murder. Indeed, this is what Reyes told the police shortly after the murder, and it is what he also told Ortega at the time. Tr. Vol. 4 at 1109-10.

Some of the eyewitnesses to the murder of Alonzo were members of the Latin Kings gang. They didn't go to law enforcement after the shooting, and in fact kept the identity of the shooter close to the vest. The Latin Kings were planning on retaliating without the help of law enforcement. To that end, a group of people met shortly after the murder at a home in East Chicago. The group included Latin Kings Michael Comanse, Simon Rubio and Roberto Rodriguez, along with Comanse's friend Michael Morris. There were other people at the home as well, but the group didn't trust everyone there, so they kept their conversation private. Comanse told the others that Reyes was driving the car that had fired upon Alonzo. Tr. Vol. 6 at 1493-95. A police confidential informant was in the house during the meeting, but he was excluded from the conversation among Comanse, Rubio, Rodriguez and Morris. Some time later, that same CI called East Chicago Police Officer Terence Fife and reported that Alfredo Alvarez "is supposedly the one who shot and killed Alonzo." Tr. Vol. 6 at 1487, 1493-94. The CI didn't say he had witnessed the shooting, or exactly when, where, or from whom he had heard the rumor that Alvarez was the shooter. Tr. Vol. 6 at 1487. He was

essentially passing along street gossip to Detective Fife. Fife reported the information to the lead investigator, Detective Washington, but never called the CI in to discuss the tip further. Tr. Vol. 6 at 1487, 1488-89. To cast some doubt on the CI's statement, the government called Comanse in rebuttal, and he testified that the CI hadn't been present during the shooting or the secret conversation. Tr. Vol. 6 at 1492-94, 1498-99.

## DISCUSSION

Reyes's motion alleges five main places where he says his trial went wrong: (1) a series of claimed errors including an alleged *Brady* violation; (2) the denial of Reyes's in-trial Rule 29 motion for acquittal before the case went to the jury, because Reyes argues there wasn't sufficient evidence to send the case to the jury; (3) the denial of Reyes's request to introduce his own hearsay statement that he made to the police shortly after the shooting; (4) the government's presentation of murders and gang violence as part of its racketeering case, which Reyes claims was cumulative and overly prejudicial; and (5) the jury deliberations, which Reyes alleges were biased by fear and an obliquely referenced possible gang-connection.

Federal Rules of Criminal Procedure 29 and 33 allow a criminal defendant to request that the Court acquit him because the evidence is so deficient on its face that no reasonable jury could convict him, and to request a new trial in the interests of justice, respectively. These are the vehicles for relief that Reyes is seeking to use through each of his various arguments.

Under Rule 29, the evidence must be viewed in the light most favorable to the government. After a jury has duly rendered its verdict, a challenge to the sufficiency of the evidence becomes even more difficult because the jury found the evidence sufficient. "In considering challenges to the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution, and then ask whether any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt. We defer to the credibility determination of the jury and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Mohamed*, No. 13-2368, 2014 U.S. App. LEXIS 13910, at *11 (7th Cir. July 22, 2014) (internal quotation marks, brackets and citations omitted).

Under Rule 33, the Court may vacate a judgment and order a new trial in the interests of justice. "When evaluating a Rule 33 motion for a new trial, our task is to determine whether the verdict is so contrary to the weight of evidence that a new trial is required in the interests of justice." *United States v. Chambers*, 642 F.3d 588, 592 (7th Cir. 2011) (citing *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999)).

Confusingly, Reyes has bunched unrelated arguments into the same heading in his brief. For clarity's sake this Order parallels the defendant's motion, and I will take up each of Reyes's arguments under the same headings that he has chosen and in the same order in which he raises them in his motion.

I.      Alleged *Brady* Violation and Other Alleged Trial Errors

**The *Brady* Claim**

Reyes first claims that the government committed a violation of its duty to turn over exculpatory information under *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Reyes made this argument at trial, the parties were heard (Tr. Vol. 1 at 15-26), I reviewed the relevant disclosures, and I issued an Order (DE 899) thoroughly addressing the issue and ultimately denying Reyes's motion to dismiss (DE 815) based on this alleged *Brady* violation. The alleged *Brady* violation and many of Reyes's other issues all relate to what Reyes sees as the undermining of his attempt to suggest to the jury that Armando Ortega actually committed the murder of Rene Alonzo, for which Reyes was ultimately convicted.

A *Brady* violation involves three elements: "(1) the evidence at issue is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence has been suppressed by the government, either willfully or inadvertently; and (3) the suppressed evidence resulted in prejudice." *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). In other words, overturning a jury verdict on the basis of a *Brady* violation is a high hurdle. The violation needs to have been so significant that there is a reasonable probability that it affected the verdict. *Id.* There is also no *Brady* violation if the defense wasn't deprived of the chance to use the evidence (i.e., if it was just delayed in using it), and if the evidence would have been

available to the defense earlier via the defense's reasonable diligence. *Id.* (citing *Boss v. Pierce*, 263 F.3d 734, 739 (7th Cir. 2001), *cert. denied*, 535 U.S. 1078 (2002)).

If a potential *Brady* violation comes to light before the trial is over, when the defense still has time to use the evidence, the late disclosure won't provide a basis for relief. If the information requires investigation and development by the defense, then a continuance is appropriate. But when the defense finds out the information in time to use it, with or without a continuance, and chooses not to, the Seventh Circuit has been clear that no post-trial relief is available for the tardy disclosure. *See, e.g., United States v. Walton*, 217 F.3d 443, 450-51 (7th Cir. 2000) ("In spite of [Defendant's] claim that he was harmed by the government's delayed production, it is interesting to note that he failed to move for either a continuance, an adjournment or a mistrial. Thus, we are of the opinion that the government's delayed disclosure of the remaining phone records did not come so late as to deny [Defendant] of the evidence's 'effective use' at trial, had he chosen to do so.") (citing *United States v. Higgins*, 75 F.3d 332, 335 (7th Cir. 1996); *United States v. Williams*, 738 F.2d 172, 178 (7th Cir. 1984)).

Reyes bases his *Brady* argument on the government's provision just before trial of two prior statements by government witness-to-be Ernesto Gonzalez — one from a 2008 police interview and the other from Gonzalez's 2012 Grand Jury testimony. (DE 946 at 2; DE 815 at 1-2.) The government had provided an unattributed summary of the contents of the Grand Jury testimony in February 2013 — a year before trial — and defense counsel never requested followup information. (DE 816 at 2-3.) Gonzalez's

statement was that a guy named Alfredo Alvarez called Gonzalez for a ride the night Rene Alonzo was murdered. When Gonzalez arrived there were three people present: Alvarez, another person later identified as Armando Ortega (the same Ortega who was punched at the Mexican Day Festival and who testified that he was in the car when Reyes shot the victim); and an unidentified third person who was described as a tall, thin, Hispanic male. Reyes is Hispanic, but he is neither tall nor thin. Gonzalez testified before the Grand Jury that when he went to pick up Alvarez, Alvarez implicated himself in the shooting, saying something like "we got this n_____, we hit him." Tr. Vol. 5 at 1290-91. (DE 899 at 2.)

As noted, several months before trial, the prosecutor, recognizing that Alvarez's statement was potentially exculpatory, provided a summary of the statement to Reyes's attorney. The summary of Gonzalez's testimony describing Alvarez's incriminating remark neglected to inform Reyes's counsel that the unidentified third person who was with Alvarez at the time the remark was made did not meet Reyes's description (i.e., that the man was tall and thin). (DE 899 at 2-3.) The government intended to call Gonzalez as a witness at trial, but he fled and could not be located. Shortly before trial, the prosecution decided to provide the entirety of Gonzalez's police statement and Grand Jury testimony to Reyes before trial. (DE 946 at 2; DE 815 at 1-2.) Reyes claimed to be surprised by the late disclosure, so I offered Reyes a continuance to investigate Gonzalez's statement. Reyes refused the offer. Tr. Vol. 1 at 18, 29-31.

Reyes hinges his argument on the point that the government knew for some time that it couldn't locate Gonzalez, so he wasn't going to testify, which Reyes claims transmutes the prior statements from Jencks material to *Brady*. (DE 946 at 3.) Reyes argues that the Gonzalez statements would have served to exculpate Reyes in the murder of Rene Alonzo, and inculpate government witnesses Alfredo Alvarez and Armando Ortega. (DE 946 at 2; DE 899 at 1-2.) Reyes further claims that Gonzalez's statements would have corroborated Reyes's own statement to the police shortly after the murder that Reyes had loaned his van to Ortega, and that is the reason it was at the scene of the shooting. (DE 946 at 2.)

Ultimately Reyes was permitted to introduce at trial Gonzalez's grand jury statement, as stipulated by the parties. Tr. Vol. 1 at 29-31; Tr. Vol. 5 at 1280. (DE 899 at 3.) Reyes's counsel was therefore permitted to argue that Reyes was not involved in the shooting of Alonzo because he didn't meet Gonzalez's description of the third man present after the murder. Tr. Vol. 6 at 1503, 1573-74. (DE 899 at 3.)

The question of the harm done to Reyes by the allegedly late disclosure is not a model of clarity. As best I can tell, Reyes is arguing that he depended on the government's listing of Gonzalez as a witness, so Reyes was counting on cross-examining Gonzalez until just before the trial, when Reyes first learned that Gonzalez could not be found. Reyes's argues that he was forced to choose between a speedy trial on the one hand and, on the other, taking a continuance to look for Gonzalez and maybe have his counsel prepare him to testify in his own defense (which Reyes says he might

have considered knowing that Gonzalez's testimony supported Reyes's). (DE 946 at 5-7.)

Reyes cites to no authority for the proposition that this choice constitutes harm that warrants overturning a jury verdict, and this is unsurprising since the Seventh Circuit's has held that late information disclosure can be remedied by allowing the defense time to use the information, with the grant of a continuance if necessary. *See, e.g., United States v. Walton*, 217 F.3d 443, 450-51 (7th Cir. 2000) ("In spite of [Defendant's] claim that he was harmed by the government's delayed production, it is interesting to note that he failed to move for either a continuance, an adjournment or a mistrial. Thus, we are of the opinion that the government's delayed disclosure of the remaining phone records did not come so late as to deny [Defendant] of the evidence's 'effective use' at trial, had he chosen to do so.") (citing *United States v. Higgins*, 75 F.3d 332, 335 (7th Cir. 1996); *United States v. Williams*, 738 F.2d 172, 178 (7th Cir. 1984)).

As I have noted, Reyes was offered a continuance, which he declined. DE 946 at 5; Tr. Vol. 1 at 29-31. Reyes can't succeed in a complaint that he didn't have enough time to deal with the late disclosure when the Court offered him the time to do just that.

Stepping back to look at the big picture, it is unclear whether Gonzalez's statement is even exculpatory, as it relates to who was present at a location well away from and well after the shooting. Ortega's testimony provided a reasonable explanation of why Reyes wasn't present when Gonzalez came by, and the jury was free to credit it. He said that Reyes's girlfriend picked up Reyes and another man after the group had

already left the minivan at Alvarez's brother's house and Alvarez had taken the gun, and the group had switched vehicles. Tr. Vol. 4 at 1086-90. Several eyewitnesses to the shooting identified Reyes as the shooter. (DE 899 at 4.) Furthermore, the government informed Reyes of the substance of most of Gonzalez's testimony months before the trial, albeit unattributed and in summary form. Reyes never requested the witness's identity or any additional information about the statement. (DE 998 at 6; DE 816-1 at 3.) But even assuming that the Gonzalez information was exculpatory and not available to Reyes through the exercise of reasonable diligence, as I've just explained the late disclosure could have been remedied by a continuance. But Reyes and his counsel chose to proceed with the trial.

In sum, there was no *Brady* violation because Reyes received the exculpatory evidence prior to trial and, in any event, if he felt sandbagged by the "late" disclosure he was given an opportunity for a continuance to investigate the matter further. The fact that he refused the continuance offer was his own choice.

### **Improper Rebuttal**

Reyes next argues that the government introduced improper rebuttal evidence. "The proper function of rebuttal evidence is 'to contradict, impeach or defuse the impact of the evidence offered by an adverse party.'" *United States v. Grintjes*, 237 F.3d 876, 879 (7th Cir. 2001) (quoting *United States v. Papia*, 560 F.2d 827, 848 (7th Cir. 1977)). A trial court has significant discretion in deciding what rebuttal evidence to admit. *Id.*; *see also*, *United States v. Goodwin*, 770 F.2d 631, 638 (7th Cir. 1985).

This issues deals with the testimony of Detective Terry Fife, and specifically a hearsay statement that Reyes was permitted to elicit from Fife. Here is how the issue developed at trial: During his case-in-chief, Reyes called Detective Fife to the stand and asked him about what a confidential informant had told Fife shortly after the Rene Alonzo murder. According to Fife, the CI told him that word on the street was that Armando Ortega and Alfredo Alvarez were responsible for shooting Rene Alonzo. Tr. Vol. 5 at 1383-86. This hearsay was admitted, over strenuous objection from the government. But I admitted the hearsay statement not for the truth of the matter asserted, but to show what if anything the information prompted the police to do. Tr. Vol. 5 at 1384. *See, e.g.*, *Jewett v. Anders*, 521 F.3d 818, 825 n.5 (7th Cir. 2008); *United States v. Hanson*, 994 F.2d 403, 406 (7th Cir. 1993). Fife testified that he passed the information from his CI along to Detective Washington, the officer responsible for investigating the Alonzo murder.

In its rebuttal case, the government sought to flesh out some of the details of the CI's statements to Fife. To that end, the government elicited testimony to the effect that the CI had told Fife he didn't have personal knowledge of the events, and Fife never took the information further than documenting the tip and passing it on to the lead investigator on the case. Tr. Vol. 6 at 1486-88. The government also re-called Michael Comanse to rebut the CI's hearsay statements. Comanse testified that the CI wasn't present at Rene Alonzo's shooting, nor could the CI have had knowledge of the shooter based on the Latin King meeting that took place after the shooting. Tr. Vol. 6 at 1492-94.

With this testimony the government sought to show that the CI really didn't know who was responsible for shooting Alonzo and that the CI was just passing along street gossip to Detective Fife.

Reyes appears to object to how thoroughly the CI hearsay testimony was rebutted, arguing that it denied him the opportunity to present a defense. (DE 946 at 10.) Reyes argues that Fife's additional testimony was somehow improper because it didn't "address what was actually in [the CI's] mind or personal knowledge." (DE 946 at 9.) With respect to Comanse, Reyes argues that he was a member of a rival gang, the Latin Kings, so his testimony was unreliable. He notes that, before calling Comanse, the government had wanted to re-call Simon Rubio, who Comanse would later testify was part of the Latin King conversation about Reyes driving the minivan. (DE 946 at 8-9.) Rubio wasn't permitted to testify at that later point because he had remained in the courtroom despite the Court's order for the exclusion of witnesses. (DE 946 at 9.) Reyes attempts to make hay of the fact that the government then immediately decided to call Comanse, instead, to testify to the same private conversation about Reyes driving the minivan. (*Id.*) Reyes suggests that the only way the government could know how its own witnesses would testify is if they'd coached witnesses or expected witnesses to coach one another. (DE 946 at 10.)

I disagree with Reyes. I allowed Reyes to ask Fife about the CI's statements, which were hearsay. But this opened the door to allowing the government to rebut the hearsay statement by exploring the hearsay declarant's credibility. An attempt to

impeach the hearsay declarant's testimony was well within the government's rights. *See* Federal Rule of Evidence 806. The government simply asked Fife to describe the CI's tip in more detail to demonstrate that what the CI was really doing was merely passing along street gossip; he really did not have firsthand evidence of who was responsible for the shooting. This rebuttal evidence was entirely proper. As for Comanse's rebuttal testimony, it was for the jury to decide its reliability. I don't find it suspicious that the government had an idea of what its witnesses would say, or that participants in a conversation would remember the conversation similarly; the jury was free to interpret the testimony this way.

### Shifting the Burden of Proof in the Closing Argument

The final argument that Reyes makes in the first section of his brief relates to what happened during closing argument. Reyes claims that the government improperly shifted the burden of proof to him during its rebuttal argument. Here's how the issue evolved: During closing argument, counsel for Reyes repeatedly argued and made reference to the fact that certain key witnesses were not called to the stand by the government. *See* Tr. Vol. 6 at 1558, 1566, 1571. Here's a sampling: Reyes's counsel asked, "Where is Alfredo Alvarez? Heard a lot about the guy. Where is Alfredo Alvarez? They didn't bring him in here. We'd like to have heard from him." Tr. Vol. 6 at 1558.  A little while later counsel returned to that same theme: "Alfredo Alvarez – where is he again? Why not bring him in here? Where is he?" Tr. Vol. 6 at 1571.

In its rebuttal argument the prosecutor briefly responded: "Mr. Friedlander [the defense counsel] asked a number of questions, where is Cooch [Alvarez]? Where is Ernesto? He has the same subpoena powers that we have. He has no burden, of course, to put on witnesses; but if he thought those witnesses would help you decide, he could bring them here just like I can." Tr. Vol. 6 at 1587. Reyes did not object to this statement when it was made. But he now claims the prosecutor's comment was improper.

Post-trial review is limited where the defendant did not object to the conduct during the trial. In such a case, the defendant must establish plain error, which means that he didn't get a fair trial *and* the conduct changed the verdict. *United States v. Wright*, 651 F.3d 764, 774 (7th Cir. 2011) (defendant "also argues that remarks and conduct of the government were improper and denied him a fair trial. [Defendant], however, did not object to any of the arguments he now raises on appeal, and so our review is only for plain error, which requires him to establish not only that the remarks denied him a fair trial, but also that the outcome of the proceedings would have been different absent the remarks." (quotation marks and citation omitted.)). In the context of missing witness comments, "where the defendant himself has broached the subject of a missing witness by asking the jury to penalize the government for its failure to produce the witness, a prosecutor's argument to the effect that the defendant has the opportunity to call witnesses is proper." *United States v. Villegas*, 655 F.3d 662, 672 (7th Cir. 2011) (citing *United States v. King*, 150 F.3d 644, 649 (7th Cir. 1998); *United States v. Sblendorio*, 830 F.2d 1382, 1393 (7th Cir. 1987) (finding that the prosecutor's observation that the defense

could produce a certain witness or witnesses if it wished neither alters the burden of proof nor penalizes the exercise of a constitutional right, rather, the argument merely conveys information that "[t]he jury is entitled to know")).

In general, allegations of prosecutorial misconduct are analyzed to determine whether they are so egregious that the defendant was deprived of a fair trial. Such allegations are reviewed in the context of the entire trial, especially whether the alleged comments or actions unfairly suggested guilt, whether the prosecutor's behavior was isolated or extensive, whether the evidence of guilt was overwhelming, and what curative instructions were given. *See Rose v. Duckworth*, 769 F.2d 402, 405 (7th Cir. 1985); *see also United States v. Goodapple*, 958 F.2d 1402, 1409 (7th Cir. 1992) (first we look at whether the remark was proper, if it was improper we look at whether, in the context of the entire trial, defendant was deprived of a fair trial).

The government's statement was arguably improper. Any impropriety wasn't due to the words of the statement, but to the facts underlying them. The government is permitted to respond to the defense's comments regarding absent witnesses by informing the jury that the defense has subpoena power, too. But the prosecution can't mislead the jury. In this case, all of the lawyers well knew that Alvarez was unavailable because he had evidently fled. So the government's comments were arguably misleading because they suggested that both sides *chose* not to call the witness, which wasn't the case. But in fairness, the government's comments were made in response to the defense's multiple closing argument statements suggesting that the government

16

could have called Alvarez, but had chosen not to. Yet the defense counsel also well knew that the Alvarez was in fact unavailable. So in context, the government was only responding to Reyes's own misleading comments. In any event, there was no objection from defense counsel, and this wasn't a point that the government belabored, but a fleeting reference made during substantial closing arguments delivered at the end of a substantial trial. In the context of a several-day trial where eyewitnesses testified that Reyes drove the minivan and fired the gun that killed Rene Alonzo, it is highly unlikely that the prosecution's comments affected the verdict.

In sum, I don't find that it was plain error to allow the prosecution's statement during closing argument to stand without corrective action, given its briefness and the lack of objection.

## II.      Denial of the Rule 29 Motion

Reyes's second claim is less complicated. He argues that the Court should have acquitted him when he requested it during the trial. (DE 946 at 11; DE 829.) He is basically asking for reconsideration of my decision not to grant him an acquittal during his trial. I considered his motion during the trial, after the close of evidence, and denied it. Tr. Vol. 6 at 1502-08. My assessment of this argument remains the same now: there was ample evidence to send the case to the jury, and no basis for the Court to overturn the jury's verdict based on a lack of evidence as a matter of law.

Before considering the sufficiency of the evidence claim, it's necessary to pause and address an argument embedded in Reyes's second claim. He says that he is entitled

to relief under Federal Rule of Criminal Procedure 34. Rule 34 requires the Court to arrest judgment if the indictment doesn't charge an offense at all, or doesn't charge an offense over which the Court has jurisdiction. Reyes mentions this Rule in the introduction to his motion, but doesn't explain how it could possibly apply, and without some explanation I fail to see how it could possibly apply because the charged crimes fall within federal jurisdiction and the parties stipulated that they occurred in this judicial district. So there is nothing left to say about Reyes's argument under Rule 34.

The defense has argued that the evidence was insufficient because the witnesses were biased and unreliable, the testimony among witnesses wasn't perfectly consistent (except when it was too consistent, as among the Latin King witnesses), and there was some evidence of possible alternate perpetrators of the murder. Tr. Vol. 6 at 1502-04. (DE 829; DE 946 at 12-14.)

I disagree with Reyes that the evidence wasn't sufficient to allow a reasonable jury to convict him. Many of the witnesses may have had incentives to testify falsely, but the defense was free to ask about those incentives, and refer to them in closing argument, and in fact did just that. Tr. Vol. 6 at 1556-57, 1561, 1566. The same went for the inconsistencies. *See, e.g.*, Tr. Vol. 6 at 1567-68. I didn't find the government's witnesses so patently unreliable that no reasonable juror could have believed them. It was a matter for the jury to sort out.

With respect to the RICO and drug conspiracies, several of Reyes's former criminal associates, some of them Imperial Gangsters, testified about IG rules and procedures, drug sales, and other criminal activity, some of it committed with Reyes and some without him. (*See* DE 998 at 13-20.) *See, e.g.*, Tr. Vol. 2 at 311-454 (testimony of Joseph Torres); Tr. Vol. 2 at 548, 557-66, 568-70 (testimony of Ace Cortez); Tr. Vol. 3 at 644-770 (testimony of Anthony Baldazo); Tr. Vol. 4 at 1016-1152 (testimony of Armando Ortega); Tr. Vol. 4 at 1187-1223; Tr. Vol. 5 at 1235-1277 (testimony of Eddie Torres, Jr.). There was ample evidence of gang activity that included drug buys and sales, burglaries, shootings, and gang exercises like doing special handshakes, recruiting new members, having meetings and paying dues. Fellow Imperial Gangsters Joseph Torres, Ace Cortez and Anthony Baldazo all identified Reyes was an Imperial Gangster who never left the gang. Tr. Vol. 2 at 390, 422-24, 426-27, 555-56; Tr. Vol. 3 at 692-93, 695-96, 699.

As for the murder in aid of racketeering charge, several eyewitnesses to the shooting of Rene Alonzo testified that Reyes was the shooter, Reyes was the driver of the minivan, or that the minivan driver was the shooter. *See* Tr. Vol. 3 at 808-10 (testimony of Michael Comanse); Tr. Vol. 3 at 861-69 (testimony of Roberto Rodriguez); Tr. Vol 4 at 931-37, 941-46 (testimony of Ricardo Perez); Tr. Vol. 4 at 1057-70, 1083-90, 1128-30 (testimony of Armando Ortega).

Of course there were inconsistencies among some of the witnesses, and many of the witnesses are gang members with reason to lie. But having listened to every witness

and evaluated all of the evidence, I find that none of these points so undermines the government's case that there wasn't enough evidence to send the case to the jury or that the jury's conviction of Reyes was manifestly unreasonable. On Reyes's allegation that the Latin King witnesses colluded to testify as necessary to convict Reyes, the defense offers nothing other than the fact that the Latin King witnesses testified consistently about the same events. But whether they were suspiciously *too* consistent was a matter for the jury to decide. Reyes's motion for judgment of acquittal is therefore denied.

### III.    Non-Admissibility of Reyes's Statement to Police

Reyes's third argument relates to the admissibility of an exculpatory statement he made to the police shortly after Alonzo's murder in which Reyes pointed the finger at Ortega and Alvarez as the ones responsible for the murder. Reyes claims that the entirety of the statement should have been conveyed to the jury, even though Reyes chose not to testify at trial. *See* Tr. Vol. 4 at 1071-81, 1099-1102. (DE 946 at 14-19.)

The fact of the matter is that the substance of Reyes's statement *was* admitted at trial making his claim to the contrary curious. The fact that Reyes had spoken to the police and implicated others in the murder came in at trial during the testimony of Ortega and Detective Isaac Washington, the lead officer investigating the Alonzo murder. Tr. Vol. 4 at 1097, 1108-11, 1138, 1140-41 (testimony of Armando Ortega); Tr. Vol. 5 at 1374-77 (testimony of Isaac Washington). Ortega testified at trial that within weeks of the murder, Reyes let Ortega know that he (Reyes) had told the police that his van had been on loan to Ortega on the night of the shooting. Ortega also testified that a

few months before Reyes's trial, the government showed him Reyes's full 2007

statement implicating Ortega in the murder. Reyes's counsel asked Ortega several

times, at different points during cross-examination, whether Ortega was angry that

Reyes had implicated Ortega in the murder, and Ortega responded each time that he

was not. Detective Washington also testified that he received information about Reyes's

red minivan, and that his investigation led him to seek out Ortega. Reyes's out-of-court

statement implicating Ortega was admissible to a limited extent because it informed

Ortega's and Washington's behavior afterwards, and it was relevant to Ortega's

motivations for testifying against Reyes. Tr. Vol. 4 at 1100, 1138. This was all hashed out

during the trial. *See* Tr. Vol. 4 at 1099-1102.

Reyes nonetheless argues that Reyes's full statement to the police should have

been admitted as evidence. (DE 946 at 14, 18.) But a defendant's out-of-court self-

serving exculpatory statement to law enforcement is generally inadmissible hearsay,

unless some exception applies. *See, e.g.*, *Stock v. Rednour*, 621 F.3d 644, 650 (7th Cir. 2010)

("We can assume that [the defendant] would have benefitted from being able to

introduce out-of-court denials without subjecting himself to cross-examination, but

excluding this obvious hearsay does not implicate the Confrontation Clause."), *cert.*

*den'd*, __ U.S. __, 131 S.Ct. 1022 (2011). It is uncontested, and incontestable, that

witnesses may be cross-examined with respect to issues affecting their credibility,

motives or bias. *See, e.g.*, *United States v. Swanquist*, 161 F.3d 1064, 1073 (7th Cir. 1998).

However, "'[t]he Confrontation Clause guarantees an opportunity for effective

cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Id.* (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)).

The thing I find baffling about Reyes's argument now is that at no point does he indicate where in the record he was prevented from asking anyone about Reyes's statement to the police. He just baldly asserts that "the defense was prevented from fully exploring these biases and motives on the part of the witnesses once it was learned not only that Reyes had willingly talked to the police following the shooting, but substantively that he had pointed a finger at Armando Ortega, telling the police he lent his minivan to Armando at the time of the shooting." (DE 946 at 17.) Among his *Brady* violation arguments, Reyes states that he wasn't able to introduce from his statement that he had "maintained his innocence, told police he lent his car to Ortega, and that he spoke to them within two weeks of the shooting (as opposed to the years that went by before the government's cooperating witnesses' statements)." (DE 8.) This is bizarre, because the transcript I'm looking at includes the following exchanges during Ortega's cross-examination by defense counsel, quoted at length because they clearly belie Reyes's claim of excluded evidence:

> Q. Okay. Well, let's -- it's interesting that you brought that
> up. **Richard told you that he gave your name to police,
> correct?**
> A. Yes, sir.
> Q. And that was on or about somewhere near September
> 27th, about **10 or 11 days after the murder**, correct?
> A. Yeah. I can't -- like I said, **about a week or so**, somewhere
> around there. I mean, they picked him up from his job for

questioning. And he told me, I mean, soon after that, a few days or so after that.

Q. So he told you, hey, I lent you my van a day before this incident at the park.

Did he say something along those lines?

A. No. **He told me that when they asked for the van that he told them I had it.**

Q. And that wasn't true?

A. No, it wasn't.

Q. But you didn't go to the police to tell them that wasn't true, correct?

A. No. Because I was advised under counsel not to go speak to any of the police officers.

Q. Well, at some point in time, did you learn that in addition to him lending you the van, when you did return it, he said that --

A. I never had his van. I mean, you're saying it like I --

Q. Well, but you learned that he gave that -- that he gave that statement implicating you?

A. He gave that, yes.

Q. Did you learn anything else about that statement?

A. After -- long time after, yes.

Q. Well, can you tell this jury when?

A. Just they -- I mean, I don't know, maybe a few months ago or something like that. You know, **I was shown reports of the full statement that he'd given against me.**

Q. So during the cooperation with the government in preparation for your trial today, you read Mr. Reyes's statement, correct?

A. This was after my statement to them.

Q. Right. But did -- my question is, during the preparation for this trial, during the period of cooperation with the government, you were shown a copy of his statement, is that correct?

A. Yes.

Q. **And in that statement you learned that he implicated you, is that correct?**

A. **Yes.**

Q. **How did you feel about that?**

A. Well, like I said, I was told this before, but I think the drugs just kind of, like, had a grip on me at the time that I didn't really fully comprehend what he had just done when

he told me that. And I just kind of -- like I said, again, under the advice of very good counsel, I was told that they had nothing. They wouldn't get nothing. So I guess I felt I had nothing to worry about.

. . .

Q. **You were mad at Richie that he went to the police ten days afterwards and gave that statement, is that correct?**
A. **No, sir.**
Q. No?
A. No.

. . .

Q. So at the end of the day **you're sitting here completely taken out of the murder scenario**, correct? [Referring to Ortega's plea deal, whereby he wouldn't be charged with the murder if he testified truthfully, although he was present during the murder and brought the gun that Reyes used.]
A. Because I told the true testimony, yes.
Q. **Four years later?**
A. **Four years later or five.**
Q. And Mr. Reyes went in -- and **Mr. Reyes went in 10 or 11 days later and gave his statement talking about you**, correct?
A. **Yes, he did.**
Q. So you had no love loss for Richie Reyes, correct?
A. What do you mean?
Q. **Well, you were pissed off at him?**
A. **No, I think if I was pissed off, I probably would have went right away. I don't see that -- like I said, four years later.** It's a heavy burden to deal with. It's something that I was just tired of carrying around with me.

Tr. Vol. 4 at 1109:2-25, 1110:1-25, 1111:1-5, 1138:1-5, 1139:25, 1140:1-14 (emphasis added).

The defense raised its argument during its closing, and again mentioned all of the points Reyes now claims to have been prevented from mentioning. Tr. Vol. 6 at 1573.

I didn't decide, and the government didn't argue, that Reyes's statement to police couldn't be referenced in asking witnesses about their motives or biases. The fact is that Reyes's attorney didn't try to ask most of the witnesses about Reyes's statement

to police, and when he did want to ask Ortega and Detective Washington about it, he was allowed to do so.

To repeat for the sake of clarity and emphasis, the only thing Reyes wasn't allowed to do was to get the entire statement in verbatim. At trial, in a sidebar conversation during Ortega's testimony, Reyes's counsel argued for the admission of Reyes's entire statement. He cited to Federal Rule of Evidence 807, a residual, or catch-all, exception for the admission of hearsay when the statement has circumstantial guarantees of trustworthiness, it is more probative of a material fact than any other evidence its proponent can reasonably obtain, and admitting it is in the interests of justice. None of those things can be said of the defendant's prior statement to police pointing the finger at someone else when he was picked up as a potential suspect. It is quite likely that a murder suspect will lie to implicate someone else and exculpate himself, so the statement bears no indicia of trustworthiness. Reyes could have testified if he wanted to reassert his inculpation of Ortega and discuss his prior consistent statement implicating Ortega. Reyes's attorney offered no other category of exception the statement fell into as a general matter, beyond its effect on listeners' actions and motives, and he was able to probe those topics quite thoroughly without using the full statement.

In short, Reyes wanted to eat his cake and have it still, deciding not to expose himself to the witness stand and jury scrutiny at trial, but testifying by proxy through

his previous self-serving statement to the police, in which he pointed the finger for the

murder at others. This is improper. As the Seventh Circuit recently stated:

> Criminal defendants often face difficult choices in weighing
> the costs and benefits of testifying. And the rules of evidence
> sometimes prevent defendants from getting their story—or
> evidence of their state of mind—before the jury in the
> particular manner they would prefer. For instance, the
> general rule against hearsay would typically prevent a
> defendant from calling a friend to the stand to relay an
> exculpatory statement the defendant said to her, in lieu of
> the defendant testifying himself. Thus, the rule against
> hearsay may burden the defendant's right to testify . . . [but]
> [t]hat sort of burden is not *impermissible* . . . .

*United States v. Beavers*, 756 F.3d 1044, 1051 (7th Cir. 2014) (emphasis in original)

(citations omitted). Reyes's statement to the police was inadmissible, and was properly

excluded.

### IV.     Conspiracy Evidence of Violence and Murder

Reyes next argues that the government was allowed to get in too much evidence

of the Imperial Gangsters' murderous and violent behavior, to the point of being

cumulative and unfairly prejudicial. Reyes was charged with being part of a gang

conspiracy. The government therefore had to prove that Reyes and others agreed to

jointly participate in a criminal enterprise, in this case a street gang. By definition, then,

it would have been insufficient to offer evidence only of crimes that Reyes committed.

The government needed to show that there was a criminal enterprise underway that

was larger than just Reyes himself. To that end, the government offered evidence of

drug sales by various members of the gang, and of three murders other than the one

with which Reyes was charged personally. That is, Reyes had no personal involvement in those three murders other than being a part of the gang in the name of which the murders were committed. Reyes's argument during trial, and again now, is that the evidence of several gang murders was overly prejudicial to Reyes, and led the jury to convict him because he was generally tarnished by testimony about wanton street violence and photos of bullet-riddled bodies.

This issue arises out of the tension between Federal Rules of Evidence 401 and 403. Generally, evidence is admissible if it is relevant. Under Rule 401, evidence is relevant if it makes a material fact (one that matters in the case) more or less probable than that fact would be without the evidence – that is, if it is probative. Rule 403 tempers the general admissibility of relevant evidence. Under it, the court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, or needlessly presenting cumulative evidence, among other undesirable effects. Reyes argues that the government's presentation of evidence of three murders and additional violence Reyes did not commit himself unfairly prejudiced the jury against him by association, muddled the issue of what Reyes himself did, and was cumulative in that it just piled on evidence of violence, overwhelming the jury.

In the current motion, the defense points out three places in the trial where he says the testimony crossed the line between appropriately probative and unfairly prejudicial. I note preliminarily that the testimony was cut off during all three, either by

a sustained objection or as initiated by the Court. First, Anthony Baldazo was in the midst of describing the many violent activities of Imperial Gangster leader Sal Chavez when I called the lawyers to the bench and stopped the prosecution, telling the lawyers "I think this is getting cumulative." Tr. Vol. 3 at 683:14. I elaborated that "[a]t some point, it becomes more prejudicial than probative, and I think it's getting to that point. So I'm going to exercise my discretion and ask that you move on to another subject matter." Tr. Vol. 3 at 683:17-20. The second instance the defense points out was when the government was trying to get Baldazo to pinpoint the amount of cocaine that Reyes distributed. After the government's third question narrowing the range, defense counsel objected on the ground that the question was leading, and I sustained the objection, and noted that the testimony the government sought would be cumulative. The government immediately moved on to another topic. Tr. Vol. 3 at 714. The final instance that Reyes's motion cites was when the government offered photos of Imperial Gangsters including Reyes throwing gang signs. Defense counsel objected to the testimony as cumulative, and the objection was sustained. Tr. Vol. 4 at 988.

There was substantial evidence of violence and murder and illegal narcotics sales, but as I said in my ruling during the trial, I don't agree with Reyes that it crossed the line into unfair, confusing, or cumulative. The examples in Reyes's motion in fact belie his argument. When the evidence began to near the line it was promptly ended, if not by defense objection then *sua sponte* by the Court. The examples demonstrate that defense counsel and I were both attuned to the issue during trial, and acted as necessary

to prevent unfairly prejudicial evidence from being introduced. I must note that the government had evidence of *thirteen* additional Imperial Gangster-perpetrated murders, and of other illegal activity, but it only presented a small portion of that evidence.

The evidence of the three murders not committed by Reyes, but by other members of the enterprise, was presented through only two witnesses each (a law enforcement officer and an eyewitness for each) and three relatively non-inflammatory photos for each. All three of these murders were alleged in the racketeering conspiracy count of the indictment and these murders were all relevant to proving that the Imperial Gangsters were a criminal enterprise.

The defense raised this objection before trial, and I addressed it thoroughly towards the beginning of trial. Here's what I said:

> And there is one thing that I want to just state on the record and just shore up the ruling I made last night 'cause I thought it might be helpful to give a more robust record as to why I'm allowing the government to introduce the evidence that we talked about at the end of the day yesterday. But the government, you know, moved in limine for a ruling that it be permitted to introduce evidence of -- at the trial – of homicides and other crimes committed by Mr. Reyes'[s] co-conspirators in furtherance of the RICO conspiracy that's charged in the Indictment. The government also filed, previous to that, a Notice of Intent to Introduce Enterprise Evidence; that was Document 732 on the docket. The defendant, of course, has opposed those filings.
> Earlier I had issued a written order that I was reserving ruling on the government's motion in limine; that is document -- Docket Entry 817.
> So yesterday evening, outside the presence of the jury, the government, as I requested them to do, indicated its intent to offer evidence of four homicides that were charged in Count One of the Indictment, which is the racketeering

and conspiracy count. Three of those homicides are alleged to have been committed by co-conspirators other than Mr. Reyes, and the fourth homicide is the one that Mr. Reyes himself is charged with.

The defendant has objected to the admission of the three homicides not involving Mr. Reyes as being overly prejudicial under Federal Rule of Evidence 403.

As I outlined in my written order on the government's motion, I expressed, you know, some concern over the connection between the homicide evidence and the existence of the criminal enterprise, which the government has indicated is really the purpose for which it is offering this homicide evidence.

. . .

The government has proffered that this evidence of this homicide will establish the existence or help to prove the existence of a criminal enterprise in a couple of ways: First, that the members of the 139th Street set as well as the 149th Street set were actually working together and were a single criminal enterprise and also that the IGs had this rule or policy that they were to shoot rival gang members on sight. The government also argues that because this particular homicide is charged in the Indictment specifically it's relevant to the crime charged.

The defendant, as I mentioned, has objected saying that this evidence should be excluded under Rule 403 as unduly prejudicial. The defendant has argued that the government has a number of other means by which they can prove the existence of the enterprise through less prejudicial means, such as by the commission of crimes by co-conspirators that are other than homicides or by other type of evidence dealing with the gang activity.

He's also objected that because Mr. Alvarez, the victim, was not, in fact, a rival gang member and was actually trying to become an IG, that the homicide could not have been committed in furtherance of the conspiracy and it's not evidence of the existence of a criminal enterprise.

As I noted earlier, in order to prove a RICO conspiracy, the government has to prove three things:

First, an agreement to conduct or participate in the affairs; second, of an enterprise; and, third, through a pattern

of racketeering activity. United States v. Olson, 450 F.3d 655 at 664, 7th Circuit from 2006.

Evidence of the Alvarez homicide is admissible as an overt act in furtherance of the conspiracy; and, more particularly, it's evidence of the existence of an enterprise.

So, first, the -- sort of the 401 analysis, Federal Rule of Evidence 401, the evidence is relevant, again, I think, specifically, to help prove the existence of the enterprise.

. . .

The next consideration, which is the defendant's real concern, is under Rule 403. And 403, of course, sanctions the exclusion of evidence only when the evidence's prejudicial effect substantially outweighs the probative value. And for the reasons I've just stated, I do find this evidence to be very probative of the existence of the enterprise, and the danger of unfair prejudice does not outweigh that value as I see it.

The government doesn't have to prove its case through the least prejudicial means. Just because evidence may be highly prejudicial does not compel its exclusion. The evidence has to be unfairly prejudicial. See, for example, United States v. Loughry, L-O-U-G-H-R-Y, 738 F.3d 166 or United States v.Chambers, 642 F.3d 588 at 595.

So here, to me, all indications are that the government, frankly, is being fairly judicious in the presentation of the evidence that they have available to it. The Indictment sets forth what the government claims are 14 homicides committed by the Imperial Gangsters and this association-in-fact enterprise or in furtherance of that enterprise.

The government has selected three homicides that it claims are sort of representative of the types of activity that the gang routinely engaged in, and these three homicides help to prove the existence of that enterprise. The government's not offering evidence of ten other homicides; and I, therefore, find that the evidence is not unduly prejudicial. It's not overly cumulative that I think it strikes a fair balance here between allowing the government to try its case in proving the existence of an enterprise but also protecting the defendant against undue prejudice.

So for all of those reasons, I'm gonna allow this evidence in.

. . .

> [M]y ruling as it stands right now only relates to the
> first [murder].
> . . .
> And I want to hear the proffer of the evidence before
> [the prosecution] introduce[s] the next two as well so I can
> make a determination that it is, in fact, evidence that makes
> more or less likely the existence of an enterprise.

Tr. Vol. 2 at 288-94.

Throughout the trial I was clear with the government that evidence of IG crime unconnected to Reyes's own acts was only coming in if it was clearly connected to proving the existence of the enterprise and was non-cumulative, and I was proactive with respect to enforcing those decisions. *See, e.g.*, Tr. Vol. 2 at 288-91 (addressing the issue of the three other murders generally, and addressing specifically testimony about the murder of Jesus Alvarez by Imperial Gangsters Galo Feliciano and Joseph Torres); Tr. Vol. 2 at 457-60, 462-63 (regarding testimony and photographic evidence about the murder of Mario Soriano by Imperial Gangster Julian Serna); Tr. Vol. 2 at 516-18 (regarding evidence of the murder of Anuar Paez by Imperial Gangster Ace Cortez).

A RICO conspiracy, by its nature, requires substantial evidence of criminal activity by various members of the conspiracy that may not have been committed by the particular defendant on trial. *See United States v. Salerno*, 108 F.3d 730, 739 (7th Cir. 1997) ("It is difficult to comprehend how one could prove the existence of an enterprise comprised of 'a group of individuals associated in fact,' and organized solely for the purpose of committing crimes, without presenting evidence of the crimes that detail the structure, common purpose, and continuity of the charged enterprise. Thus, we have

allowed the government to use uncharged criminal acts in a RICO prosecution to prove the nature of an enterprise and the defendant's participation in it.").

In sum, the amount of evidence admitted in Reyes's trial relating to the existence of a criminal enterprise struck the appropriate Rule 403 balance. Only evidence of three murders (not including the one Reyes was charged with) was admitted at trial. Ten other murders that were alleged in the RICO conspiracy count of the indictment were not even pursued by the government. Each of the three murders that were introduced were presented in a straight-forward and non-prejudicial way. The evidence was highly probative in proving the existence of the criminal enterprise, and it was therefore properly admitted at trial.

## V.      Allegations of Jury Impropriety

Reyes's final argument alleges jury impropriety and seeks to interview jurors. He previously filed a separate motion asking for exactly the same thing, for exactly the same reasons (DE 924), and in fact describes the treatment in this later compound motion as a reply to the government's response to his previous motion. (DE 946 at 21.) Reyes suggests that the jury convicted him based on gang-related fear (although there are only vague insinuations of what or who frightened them), and makes a vague allegation that perhaps some member of the jury had an undisclosed connection to the Latin Kings gang.

I've already addressed this issue in denying Reyes's separate motion to interview the jurors. (DE 960.) This District's local rules require a party or attorney to seek court

permission to contact jurors off the record. N.D. Ind. L.R. 47-2. Trial courts have substantial discretion in deciding whether to allow such contact with jurors. In deciding whether this contact is appropriate, reference is often made to Federal Rule of Evidence 606(b), which governs the topics a juror may testify about during an evidentiary hearing. Internal jury processes are off limits, but outside influences are fair game. *See, e.g.*, *United States v. Torres-Chavez*, 744 F.3d 988, 997 (7th Cir. 2014); *see also*, *Tanner v. United States*, 483 U.S. 107, 119-20 (1987). To protect the jury system by preventing post-trial imposition on jurors from becoming a regular occurrence, a party seeking to interview jurors has to make a threshold showing, alleging something specific and a basis for that allegation. *See, e.g.*, *United States v. Wilson*, 715 F.2d 1164, 1172 (7th Cir. 1983) (defendant required to prove communication occurred before interviewing jurors); *United States v. Gravely*, 840 F.2d 1156, 1159 (4th Cir. 1988) ("Defendant's request was properly denied because he made no threshold showing of improper outside influence."); *United States v. Davila*, 704 F.2d 749, 754 (5th Cir. 1983) ("Defendants failed to make any preliminary showing of misconduct. The motion sought simply to discover what happened in the jury's deliberations in the hope of uncovering an impropriety."); *King v. United States*, 576 F.2d 432, 438 (2nd Cir. 1978) ("[T]o authorize a post-verdict inquiry, there must be 'clear evidence', 'strong evidence', 'clear and incontrovertible evidence', 'substantial if not wholly conclusive evidence'.").

Here, Reyes's attempt to meet the threshold requirement consists of describing the jury's notes to the Court during deliberations with an unwarranted leap to the

conclusion that external influences were at play. He also states that "it is believed that a member of the jury may have a possible relation to a member of the Latin Kings." (DE 946 at 22.) Which juror this is, or what the "relation" is, or what the belief is based on are is all left unsaid.

The jury's notes asked (1) whether the jury foreperson would be publicly identified (expressing concern at this prospect), (2) for clarification between two jury instructions, and (3) for a new copy of the verdict sheet. Defense counsel was consulted before the Court responded to each note, and expressed no objections to the Court's proposed responses. Tr. Vol. 6 at 1628, 1632, 1633. After the jury was polled the defense said no when I asked if there was anything that required discussion. Tr. Vol. 6 at 1639. In any event, I can't see anything inherent in the notes, individually or taken together, that suggests they originated from anything other than the internal workings of the jury. The latter two notes relate to jury instructions and the verdict sheet, which are absolutely related to the jury's inner processes, and could only be. The first note might theoretically be related to external forces, but is at least equally as likely to have resulted from the evidence presented at trial of gang violence, and the latter doesn't invalidate a jury's verdict. *See United States v. McAnderson*, 914 F.2d 934, 943 (7th Cir. 1990). Without a threshold showing that external forces were at play, I can't just assume they were – there's simply no basis to do so.

As I wrote in my previous Order on this subject, "Reyes offers only threadbare factual assertions and an unpersuasive interpretation of the trial record in support of his

request for extraordinary permission to privately interview the jurors. The request must be denied. The jurors in this difficult case diligently performed their service, and they ought not be harassed by curious lawyers acting on a hunch." (DE 960 at 7-8.) *See also*, *United States v. DiDomenico*, 78 F.3d 294, 302 (7th Cir. 1996).

## CONCLUSION

There is no basis to overturn the jury's verdict and acquit Reyes or order a new trial, and so Reyes's motion is **DENIED**. (DE 946.)

**SO ORDERED**.

ENTERED: September 23, 2014

/s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
