UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| UNITED STATES OF AMERICA, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | NO. 2:11CR77 PPS |
|  | ) |  |
| RICHARD REYES, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

**OPINION AND ORDER**

After a six-day trial, Richard Reyes was found guilty of RICO conspiracy, a drug conspiracy, the murder of Rene Alonzo in aid of racketeering, and the use of a firearm resulting in the murder of Alonzo (Counts 1, 2, 7 and 8). A Motion for Judgment of Acquittal, Arrest of Judgment, or New Trial was previously denied. [DE 946, 1068.] Now before me is Reyes' second such motion, and this one is based on newly discovered evidence [DE 1576 and 1824]. The motion stems from a post-trial statement of Reyes' son, Vincent Garza. Garza claims that another individual, Alfredo "Cooch" Alvarez, admitted to Garza that he was the one who killed Alonzo and that Reyes went down for a murder he didn't commit. [DE 1576 at 2.] In addition to pressing a claim of newly discovered evidence entitling him to a new trial, Reyes also makes a renewed argument based on *Brady.* An evidentiary hearing was held at which both Garza and Alvarez appeared and testified. The *Brady* claim is groundless because the government did not suppress evidence; Garza's statement came into the government's possession

well after the trial. And the newly discovered evidence — Garza's statement — would not have made any difference in the outcome of the trial. So the motion will be denied.

Richard Reyes was one of 26 defendants charged in an indictment involving the operation of the street gang known as the Imperial Gangsters. The indictment charged racketeering and drug conspiracies that spanned more than a decade. The racketeering acts included run-of-the-mill street gang activity: robberies, drug dealing and 14 murders, mostly of rival gang members, as well as several attempted murders. There was substantial and persuasive evidence of Reyes' guilt on the RICO conspiracy and drug conspiracy counts. Reyes was a long-time member of the Imperial Gangsters. The evidence established that Reyes engaged in a variety of gang activity including participating in a series of robberies and burglaries of drug dealers to further the interests of the Imperial Gangsters. The evidence also established that Reyes was a large-scale marijuana and cocaine dealer and conspired with other Imperial Gangsters in his drug dealing activities. Reyes' guilt on these counts is beyond question; several Imperial Gangsters who pled guilty and cooperated testified credibly to these facts. And there was also persuasive photographic evidence of Reyes' membership in the Imperial Gangsters. Reyes' convictions on the two conspiracy counts are not directly at issue in the present motion for a new trial.

What is at issue is Reyes' conviction for murder in aid of racketeering. The victim, Rene Alonzo, was a Latin King gang member who had a long-standing feud with the Imperial Gangsters. Alonzo was killed in a drive-by shooting outside the U.S. Bar in East Chicago on September 16, 2007. A brief overview of the evidence of the murder is necessary to put the present motion into some context.

What led to the murder of Rene Alonzo was a meaningless dispute earlier in the day at the Mexican Independence Day festival. After watching the parade, a man named Armando Ortega was at the festival with several friends when a stranger ran up and tried to sucker punch him in the head. [DE 905 at 135.] Ortega didn't recognize the assailant, but remembered seeing him in a group with Fetty Lozano, who Ortega believed was responsible for the assault. [*Id*. at 135, 139.] In the ensuing ruckus, Ortega was taken out of the festival by police. [*Id*. at 138.] Ortega spread word about the assault, including to his friend Alfredo "Cooch" Alvarez. [*Id*. at 140-143.] Ortega was not himself a gang member, but was acquainted with Reyes, an Imperial Gangster, through Cooch, their mutual friend. [*Id*. at 111, 118, 126-27.]

That evening, Cooch Alvarez arranged for Reyes to pick up Ortega in his maroon van, with Pedro Ramirez in the back. According to Ortega, he gave Reyes his gun when he got into the van. [DE 905 at 151-52.] Although he gave Reyes his gun, Ortega was only anticipating a fistfight with Fetty Lozano or one of his Latin King associates in

3

retaliation for the attempted battery. [*Id*. at 154-55.] Ortega testified that as the van rolled past the U.S. Bar, he saw Fetty get out of a car and throw a Latin King gang sign. [*Id*. at 155-56.] When Reyes saw Fetty throwing Latin King gang signs, Reyes responded by using Ortega's gun to open fire through the window, shattering the glass. [*Id*. at 156-57.] Latin King Rene Alonzo was outside the bar and was fatally injured in the shooting.

Aside from Ortega, there were several witnesses to the murder. Ricardo Perez was outside the U.S. Bar the night of the shooting. He testified that he saw the van pull up in front of the bar, and the driver open fire. [DE 905 at 22, 24.] He was struck in the leg. [*Id.* at 26.] He later identified Reyes as the shooter in a police lineup and then again at trial. [*Id.* at 33, 35.] Another witness to the shooting was Robert Rodriguez. He was outside the bar with Rene Alonzo when he saw the van being driven by Richard Reyes pull up in front of the bar. [DE 904 at 239, 244.] He saw a muzzle flash from the window of the van. [*Id*. at 242-43.] Rodriguez was familiar with Reyes, who was a good friend of Rodriguez's uncle. [*Id*. at 246.] Rodriguez had an unobstructed 8-10 second view of the driver who he identified as Reyes. [*Id.* at 245.] Yet another witness was outside the bar that night, Michael Comanse. He testified that he saw the van pull up to the front of the bar and saw the driver of the van, Richard Reyes, open fire. [*Id.* at 174, 176, 186-89.] Although Comanse did not know Reyes personally, he knew who he was.

4

They had taken a GED class together a few years earlier. [*Id.* at 184.] Comanse told the jury that he had 3 to 4 seconds in which to see Reyes. [*Id.* at 178.]

As noted above, the new evidence that prompted this round of motions centers on the report of Vincent Garza's proffer interview that took place eight months after trial while the government was debriefing Garza on its continuing investigation of gang activity in East Chicago. Garza is Reyes' son and a second generation Imperial Gangster who was also charged in the present case. Shortly before trial, Garza pled guilty to racketeering conspiracy and two counts of murder in aid of racketeering, and has been cooperating with the government ever since. Here is the pertinent information from the report of Garza's interview taken eight months after Reyes' trial:

> 13. GARZA recalled a 2013, conversation with Alfredo "COOCH" ALVAREZ in the Marktown section of East Chicago, Indiana while sitting in a car smoking marijuana. GARZA stated that during this conversation, ALVAREZ told him (GARZA) that he (ALVAREZ) shot Rene ALONZO, and not REYES. GARZA further recalled that on the night of the murder, Pedro RAMIREZ had a pistol with tape on the handle inside of van.

[DE 1576-1 at 4.]

At the December 1, 2015 hearing on the pending motions, Garza elaborated on the conversation with Cooch Alvarez. Garza testified that as he and Alvarez were smoking, "Cooch, out of nowhere, just told me that my dad was, like, you know what I'm saying, a good dude because my dad went down for him 'cause he said that he killed Rene Alonzo." [DE 1805 at 49.] Counsel clarified that Garza was testifying that

5

Alvarez had "specifically told (Garza) that (Alvarez) shot and killed Rene Alonzo," and "it was not Richard Reyes." [*Id*.]

Garza's report of what Cooch Alvarez is alleged to have said to him is not the only newly discovered evidence that Reyes relies upon. More recently, another witness, Juanita Martinez, has offered a statement to law enforcement, followed by testimony at a February 18, 2016 hearing on the present motion. Martinez testified that she was also present outside the U.S. Bar on the night Rene Alonzo was shot. According to Martinez, she did not see Comanse, Perez and Rodriguez — the witnesses from the trial who all fingered Reyes — outside the bar that night. Finally, at the hearing on the motion for a new trial, Reyes also offered the testimony of Francisco Gamez concerning reports in the community about the shooting.

After several rounds of briefing and two evidentiary hearings, Reyes' renewed motion for new trial is now ripe for ruling.

## **The *Brady* Claim**

As I've explained in prior orders, a *Brady* violation involves three elements: "(1) the evidence at issue is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence has been suppressed by the government, either willfully or inadvertently; and (3) the suppressed evidence resulted in prejudice."*United States v. O'Hara,* 301 F.3d 563, 569 (7th Cir.2002), citing *Strickler v. Greene,* 527 U.S. 263, 281–82 (1999). A motion for new trial based on a *Brady* violation faces a high hurdle. The

6

violation needs to have been so significant that there is a reasonable probability that it affected the verdict. *Id.*

Reyes' *Brady* claim is a non-starter because he is unable to show that the government suppressed the favorable evidence. As I noted above, besides being Reyes' son, Garza is a co-defendant in this case. Garza entered a guilty plea on January 3, 2014 to a charge of racketeering conspiracy and to the homicides of Michael Sessum and Miguel Mejias in aid of racketeering activity. His cooperation with the government is ongoing. I find no basis for doubting the government's explanation that it obtained Garza's statement during a post-plea proffer interview on August 25, 2014, seven months *after* Reyes' trial, and that it disclosed the evidence to Reyes a week later.

Reyes attempts to cast doubt on the government's claim that Garza's statement was received only after Reyes' trial. [DE 1576 at 3-4.] He also suggests that even if the statement was made after trial, the government could have obtained it prior to trial. [*Id.* at 4.] These speculative arguments are unpersuasive, and Reyes gilds the lily in attempting to support them. Reyes repeatedly asserts that the government has committed previous *Brady* violations, when in fact I have found none. For example, Reyes suggests that the government turned over statements by Ernesto Gonzalez "on the eve of trial, in violation of Brady and Rule 11 rulings." [DE 1576 at 4.] This is contrary to my analysis and ruling on Reyes' earlier motion for judgment of acquittal. [DE 1068 at 9-11.] Because I find that the government did not suppress the Garza statement, Reyes' *Brady* claim cannot succeed.

7

The *Brady* claim also fails for lack of prejudice. By definition, Reyes' trial defense in January 2014 was not prejudiced by the unavailability of a statement that had not yet been made and did not yet exist. For this reason, the post-trial statement does not lend itself to a *Brady* analysis, but instead is more appropriately considered on a newly-discovered evidence theory. *Whitlock v. Brueggemann*, 682 F.3d 567, 587-88 (7th Cir. 2012). Finally, as discussed fully below, I agree with the government that there is no reasonable probability that the recently received statement and testimony of Garza would have produced a different outcome at trial. [DE 1586 at 7.] So I reject Reyes' argument made on *Brady* grounds.

## Newly Discovered Evidence

Reyes fares no better seeking relief on the ground that the Garza statement is newly discovered evidence entitling him to a new trial.

> In order to receive a new trial based on newly discovered evidence, defendants must demonstrate that the evidence "(1) came to their knowledge only after trial; (2) could not have been discovered sooner had due diligence been exercised; (3) is material and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a retrial."

*United States v. Eads*, 729 F.3d 769, 780 (7th Cir. 2013), quoting *United States v. Ryan*, 213 F.3d 347, 351 (7th Cir.2000). When a defendant was previously aware of "the substance" of the information, evidence may not be "newly discovered." *United States v. Theodosopoulos*, 48 F.3d 1438, 1448-49 (7th Cir. 1995). The government contends that the essence of the Garza statement was already known to Reyes prior to trial, in the

8

form of Ernesto Gonzalez's statement that, after the shooting, Alvarez had said "We got this N-gger, we hit him." [DE 1586 at 7-8.] The government in effect takes the position that the earlier known Gonzalez statement, because it might similarly constitute Alvarez taking credit for the shooting, contains the "substance" of the Garza statement. That position is absurd. What Garza has to say *is* newly discovered evidence. The fact that someone else (Ernesto Gonzalez) previously said the something similar, does not render Garza's statement old news. It remains newly discovered evidence.

Gonzalez fled the area before trial and could not be located by either party. But the jury nonetheless heard what he had to say because Gonzalez's grand jury testimony was read at trial by agreement of the parties. The government argues that the merely equivalent Garza statement cannot be material, as required for Reyes to get any relief. This is entirely unpersuasive. It is one thing for one person (Ernesto Gonzalez) to have said that Cooch Alvarez confessed to the crime that Reyes was later convicted of. It's quite another thing for yet another person (Garza) to have said the same thing — that Alvarez confessed to him as well under totally different circumstances and at a different time. Two statements are more persuasive than one; they can serve to corroborate one another. So I reject the government's argument that Garza's statement is not material and merely cumulative.

The government also argues that by exercising due diligence, Reyes could have obtained his own confirmation of Alvarez's claim of responsibility, from any of three witnesses – Alvarez himself, Gonzalez, or Garza. [DE 1586 at 8.] That position is

9

unreasonable and unrealistic. Before trial began, Alvarez and Gonzalez had disappeared. The government's own efforts to locate them and call them as witnesses were unsuccessful. Although Garza is Reyes' son, prior to Reyes' trial Garza was himself a co-defendant in custody, represented by counsel and negotiating his own plea agreement, so that Reyes "had no access to Garza." [DE 1642 at 5.] Reyes' argument is not defeated by a showing that through the exercise of due diligence he could earlier have discovered the evidence he now relies on.

Given these conclusions, the newly-discovered evidence claim comes down to one issue: is there likely to be an acquittal if there were a retrial and the jury had the Garza and Alvarez statements available to it as well as the other new evidence? I think the answer is no. Reyes first claims that, with this additional evidence, he would have a much greater incentive to testify. [DE 1576 at 6; DE 1642 at 7.] Any assertion that Reyes would testify if granted a retrial with this additional evidence is entirely speculative, and cannot be persuasive in the absence of any indication what his testimony would be. I dismiss that contention from my analysis.

Rule 33 grants district courts discretion to grant a new trial "if the interest of justice so requires." As a practical matter, this standard is quite high, and relief is "'reserved for only the most extreme cases.'" *United States v. Hagler*, 700 F.3d 1091, 1101 (7th Cir. 2012), quoting *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998). I now have the benefit of the new evidence offered by Vincent Garza and Alfredo Alvarez, as well as Juanita Martinez and Francisco Gamez, all of which I consider in determining

whether the availability of this testimony at a retrial would probably lead to Reyes' acquittal. I am not persuaded that the standard is met.

The supposed bombshell for the defense is Garza's claim that Alvarez once admitted to Garza that he was the one who killed Alonzo. If Alvarez was called to testify at trial, it isn't likely that a Perry Mason moment would ensue. Quite to the contrary. We know this because Alvarez testified at the evidentiary hearing on the present motion. (By this time, he had been located by the government.) Instead of agreeing with Garza, he flatly denied both that he had any role in the shooting of Alonzo and that he ever made such a statement to Garza. In fact, Alvarez testified in a manner consistent with the government's theory at trial — namely that Alvarez was not present for the shooting and that the shots were fired from Reyes' maroon minivan, driven by Reyes, with Ortega in the passenger seat and Pedro Ramirez seated behind them.

The government rightly contends that other aspects of Garza's statement and testimony favor the prosecution rather than the defense. Garza's testimony contradicts Reyes' own claim that he had loaned his minivan to Ortega and was not in possession of it on the night of the shooting. To the contrary, Garza testified that he was riding with Reyes in the van earlier that night. Garza also testified that when they drove by the U.S. Bar — the scene of the murder — they saw some Latin Kings "throwing up" gang signs in a manner that provoked tough talk from passenger Pedro Ramirez and could have provoked Reyes' later return to the bar with violence in mind. This is also

11

consistent with Ortega's trial testimony about Ramirez praising Reyes after the shooting for such a powerful response to a Latin King "throwing up" his sign to a "real gangster." [DE 905 at 172.]

What's more, Garza's testimony about accompanying Reyes to pick up his van the next day, after its broken window was repaired, is consistent with the government's other evidence via Ortega concerning the shattering of the driver's window by Reyes' gunfire. Garza's firsthand account of Reyes' visit to his Santeria priest the day after the shooting is also consistent with Ortega's trial testimony that Reyes told him he had taken the van to the priest. In sum, other than the claim about Alvarez's alleged admission, which Alvarez has now flatly denied, Garza's testimony is more favorable to the prosecution than the defense, and so is not likely to produce a different result on retrial.

Alvarez's testimony further supports the government's narrative that the shooting was carried out from Reyes' maroon minivan, driven by Reyes, with Ortega in the passenger seat and Pedro Ramirez in the rear, and that Alvarez was not present for the shooting or at the scene. In the main, Alvarez's testimony also mirrors Ortega's as to Alvarez's role in the temporary storage of the van overnight at Alvarez's brother's house.

It is true that there are some discrepancies between Ortega's and Alvarez's testimony as to the evening's events insofar as they involve Alvarez. Armando Ortega testified at trial that after the shooting, Reyes called Alvarez, but Alvarez testified he got

12

the call from Ortega.  But both accounts result in the arrangement to take the van to Alvarez's brother's house, where it was parked overnight.  Ortega says they went to the gas station *after* parking the van at Alvarez's brother's house, but Alvarez testified that he drove to the gas station *first* to meet Reyes and the minivan, which followed Alvarez from there to his brother's house.  Ortega testified that afterward Alvarez drove Reyes and Ramirez back to the gas station to meet their ride, and then Alvarez drove Ortega to a bar.  Instead, Alvarez testified that after parking the van next to his brother's garage, he drove all three back to his house in East Chicago, where Ortega stayed a while but Reyes and Ramirez left.  But these differences about inconsequential logistical matters are not likely to have an impact on the credibility of the critical testimony the two witnesses have in common — namely the identities and positions of the three players in the maroon minivan at the time of the shooting, and Alvarez's role in helping park the van somewhere "safe" for the night.

Alvarez's testimony adds detail about Reyes picking the van up the next day, tossing shell casings from the van into the yard, sweeping shards of glass off the passenger seat, and removing a gun-shaped object wrapped in a rag.  If believed, this testimony also weighs against Reyes' acquittal in the event of a retrial.   Alvarez also testified that he received an accusatory call from Fetty Lozano after the Alonzo shooting, in which Lozano asked "why did you do that to my boy?"  [DE 1805 at 191.] The mere accusation of course does not establish Alvarez's personal responsibility for the shooting, and may not even signify it, if intended as a communal "you," meaning

13

the Imperial Gangsters, Alvarez's "people". This aspect of the Alvarez testimony doesn't significantly impact my assessment of the likelihood of an acquittal if it were used at trial.

Finally, I consider the new testimony offered by witnesses Juanita Martinez and Francisco Gamez. Martinez was at the U.S. Bar with the murder victim (Rene Alonzo) and others the night of the shooting. She testified that she raced from the bar after hearing the shots fired, to find Alonzo lying on the ground outside. The defense offers her testimony to challenge the eyewitness identification of Reyes by trial witnesses Michael Comanse and Roberto Rodriguez, who claimed to be outside the U.S. Bar when the red minivan drove past and the shooting occurred. Martinez testified that she never saw Comanse, Rodriguez or Simon Rubio outside the U.S. Bar that night.[1]

I do not credit this testimony with much weight in a jury's determination concerning the murder. As a general proposition, what a witness did *not* see is not as significant a factual offering as what a witness affirmatively saw. In this particular instance, the police report of Detective Gruszka indicates the first person interviewed on the scene was Robert Rodriguez. That is persuasive evidence that Rodriguez was in fact present. The testimony of Comanse could support the conclusion that Martinez did not see Comanse for either of two reasons -- because he was too far down the street for

---

[1] In his trial testimony, Rubio did not claim to be on the scene. Instead, he testified that the next day he had a private conversation with Comanse and Rodriguez in which they told him they'd seen Reyes driving the van. [DE 905 at 259.]

Martinez to notice in the chaotic circumstances, or because Comanse fled the crime scene promptly to avoid an arrest for which he was "wanted." [DE 904 at 192.]

In any event, the circumstances were traumatic ones for Martinez as a friend of Alonzo's, and her focus would understandably have been on him rather than the perimeter of the scene, so that she may not have had as wide a perception as she believed. An indication of that is the evidence that bystander Matthew Sincan was at the scene of the shooting and fired back at the minivan – a fact of which Martinez was unaware. Neither did Martinez see the maroon minivan fleeing the scene, despite her claim that she exited the bar immediately upon hearing shots fired. So there are reasons to doubt the accuracy or pertinence of Martinez's essentially negative testimony.

Gamez, the father of several children with Martinez, testified that he had been told by a Josh Marrero that Comanse and Rodriguez were letting it be known that they had been lying when they testified against Reyes, just because he was a rival gang member. Whether or not this multi-layered hearsay would be admissible or persuasive to counter Comanse's and Rodriguez's identification of Reyes, the weight of that testimony is at least balanced by another statement Gamez attributes to Marrero. Gamez testified that Marrero also reported that Pedro Ramirez, Marrero's cousin, told him that "the day of the murder it was Pedro, Richie Reyes, and Mando Ortega in the vehicle during the murder." [DE 1818 at 35.] Ramirez did not testify at Reyes' trial. This statement (if admitted) would confirm the testimony of other witnesses such as

15

Armando Ortega and Alfredo Alvarez as to the participants in the drive-by shooting of Alonzo, and is clearly incriminating as to Reyes.

For purposes of determining the impact of all the new evidence on a possible retrial, I have reviewed the entire 1800+ page trial transcript, as well as the new documentary evidence and transcripts of my December 1 and February 18 evidentiary hearings. Applying the high standard applicable to overturning a jury verdict on the ground of newly discovered evidence, I am not persuaded to grant Reyes a new trial on the basis of the new testimony of witnesses Garza, Alvarez, Martinez and Gamez that has been presented for my consideration.

**ACCORDINGLY:**

Defendant Richard Reyes' Additional Grounds and Renewed Motion for Judgment of Acquittal, Arrest of Judgment or New Trial [DE 1576] and Motion in the form of Summary of Evidence that Warrants a New Trial [DE 1824] are DENIED.

Sentencing is set for Monday, November 28, 2016 at 1:00 p.m. Hammond/ Central Time.

**SO ORDERED**.

ENTERED: July 26, 2016

/s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT